IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| PAULA R. MOYER,<br><br>Petitioner,<br><br>vs.<br><br>DEBORAH K. JOHNSON, Warden,<br>Central California Women's Facility,[1]<br><br>Respondent. | No. 2:12-cv-01170-JKS<br><br>MEMORANDUM DECISION |

Paula R. Moyer, a state prisoner represented by counsel, filed a Petition for Habeas

Corpus with this Court pursuant to 28 U.S.C. § 2254.  Moyer is in the custody of the California

Department of Corrections and Rehabilitation and incarcerated at the Central California

Women's Facility.  Respondent has answered, and Moyer has replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On September 11, 2007, Moyer and her co-defendants, James Ray and Christopher

Morgan, were charged with murder in connection with the May 5, 2006, robbery and subsequent

death of a 78-year-old man.  The information also alleged robbery and burglary special

circumstances.

On direct appeal of her conviction, the California Court of Appeal recounted the

following facts underlying the case against Moyer:

> Farhan Jweinat lived in the Vacaville home of his son Suleiman[2] and his family.
> Farhan was in good health for his age, although he suffered from coronary artery disease
> and had stents in two arteries.  On the afternoon of May 5, 2006, while other members of
> the Jweinat family were not at home, neighbors discovered Farhan standing in the front

---

[1]     Deborah K. Johnson, Warden, Central California Women's Facility, is substituted
Walter Miller, former Warden, Valley State Prison for Women.  FED. R. CIV. P. 25(c).

yard, covered in blood with his hands tied behind his back. Farhan said in broken English, "[T]hey won't stop hitting me, they won't stop hurting me, they just keep hitting me over and over." He said they had wanted money and he gave them $700. Farhan was taken to the hospital for treatment, where he told Detective Carey of the Vacaville Police Department that his attackers were two "American" men in their 30s.

> FN2. Because this opinion refers to family members who share the same last name, we sometimes refer to them by their first names only. No disrespect is intended.

Farhan's daughter-in-law Vera Jweinat rushed home after she learned what had happened. She walked through the house with Detective Carey and saw that every room had been ransacked. There was blood on the floor in the kitchen, family room, Farhan's bedroom and an adjacent bathroom. Farhan's bedroom, which was usually spotless, was in disarray, and his dentures were found in a large pool of blood in the kitchen. Vera found a bottle of pepper spray on her bedroom dresser that did not belong to her, and Detective Carey smelled pepper spray and noticed a liquid that appeared to be pepper spray on the kitchen floor. Vera discovered that gold jewelry worth between $50,000 and $70,000 was missing, as was a computer, a Gameboy, her son's tennis shoes and various household decorations. One of the neighbors had seen a blue car parked in the Jweinats' driveway and had noticed a woman with long black hair and a red sweater near the car.

Appellant Moyer, who has long black hair, had recently worked as a housekeeper for the Jweinats. Farhan had been home when Moyer came to clean, although the two did not have much interaction because Farhan's English was limited. In March 2006, Vera Jweinat had discovered that about $60,000 to $70,000 in casino winnings was missing from its hiding place in her master bedroom, and she suspected Moyer of taking it. She reported the theft to police, but then asked them to stop the investigation because her daughter was afraid. Vera had asked Moyer to return for one final cleaning job, intending to confront her, but when Moyer came over, Vera changed her mind and decided not to raise the subject.

After reviewing the police report regarding the March 2006 theft, Detective Carey decided to contact Moyer about the current burglary and assault on Farhan. Carey went with other officers to Moyer's house in Woodland at about 11:45 p.m. on May 5, 2006, the same day as the burglary and assault. They found a black ring on the counter next to Moyers's purse and a bracelet inside the purse, both of which were later identified by Vera Jweinat as belonging to her. The purse also contained a receipt from a McDonald's located about half a mile from the Jweinats' home, which was generated on May 5, 2006, at 12:33 p.m. Moyer's boyfriend Paul Hinojosa was present and his black Acura was parked in the driveway. The car was impounded and later searched, during which time officers found a red sweatshirt and three rings belonging to Vera Jweinat.

After interviewing Moyer, police went to the home of her next door neighbors, appellant James Ray and his girlfriend Karly Harrison. Ray was discovered hiding under the bed with a gun holster underneath him, and a handgun was found under the mattress. He was carrying a wallet with over $400 in cash, and another $200 in cash was inside the

pocket of a pair of shorts found in the bedroom.  Jewelry that was later identified as belonging to Vera Jweinat was found in the bedroom closet, hidden between some pants that were folded on a shelf.  A pair of black pants found in the house ultimately tested positive for Farhan Jweinat's blood.[3]

> FN3. The pants had a size 38 waist. The blue jeans Ray was wearing at the time of his arrest had a size 33 waist.

Meanwhile, Farhan Jweinat remained in the hospital for treatment.  On May 17, 2006, he suffered a cardiac arrest and stopped breathing after receiving surgery for a broken jaw that he suffered during the attack.  He was resuscitated, but remained in a persistent vegetative state and ultimately died on March 19, 2007, about 10 months after the attack.  According to Dr. Arnold Josselson, who performed the autopsy, the cause of death was "anoxic encephalopathy (loss of oxygen to the brain) due to blunt force injuries."

Although she initially lied to the police to protect Ray (who wrote her love letters while they were both in jail), Karly Harrison ultimately became the principal witness for the prosecution and was allowed to plead guilty to first degree burglary with a maximum sentence of four years in exchange for her truthful testimony at appellants' trial.  She testified to the following events surrounding the burglary of the Jweinat home:

Harrison had met Ray while they were both residents in a drug and alcohol rehabilitation center in 2005.  They moved in next door to Moyer and her boyfriend Hinojosa, with whom they became acquainted.  Moyer bragged to Harrison about taking $74,000 from a house in Vacaville while she was working as a housekeeper, and said she had bought two cars with the money after spending $5,000 on drugs and in casinos.  In March 2006, Moyer told Harrison she had been called to clean the house again and was nervous that it might be a "setup."

Moyer, Ray and Hinojosa discussed burglarizing the Jweinats' house to see whether they had more cash.  Harrison was opposed, because she was worried that Ray would get into trouble and go to prison.  The plan was to commit the burglary on May 4, 2006, but it did not go forward and Hinojosa said he could not do it the following day because he had an appointment he could not miss.  Moyer came to Ray and Harrison later that night and told them that Hinojosa's brother Chris (appellant Christopher Morgan) could stand in for Hinojosa.

Early the next morning, May 5, 2006, Moyer came to the house and gave Harrison a line of methamphetamine.  Moyer also brought over some beanies, walkie talkies and gloves.  Harrison understood that they were going to burglarize the Jweinats' house that day, and Ray convinced her to come along so she could make sure he stayed in the car and did not go inside the house.

Harrison and Ray drove to Vacaville in Ray's car, a teal blue Corsica, and met Moyer and Morgan at a McDonald's near the Jweinats' home.  Moyer and Morgan were driving the black Acura owned by Hinojosa.  After having lunch, Moyer told Harrison to get into the Acura with her, while Ray and Morgan got into the Corsica.  Moyer led the way to the Jweinats' house, parked on the street and then conferred with Ray and

Morgan. Ray parked the Corsica in the Jweinats' driveway and went toward the house with Morgan.  Moyer received a call on her cell phone and Harrison heard her tell the caller to use the back door because it was always open.

     As she and Harrison were waiting in the Acura, Moyer changed into a red sweatshirt.  After about 10 minutes, Moyer told Harrison to drive her to the Jweinats' house so she could "get them out."  Moyer went inside the house while Harrison drove back to their original parking place, and about 10 minutes later, Harrison saw Moyer, Ray and Morgan come out of the house and get into Ray's car.  Harrison met them back at the McDonald's, where she noticed that Morgan had blood on his clothes.  Moyer and Morgan drove away in the Acura, while Harrison rode home in the Corsica driven by Ray.  Ray told her that everything had "got all fucked up," and "the less you know the better."  He showed her a gun in a holster and told her he got it during the burglary.[4]

     FN4. Although Suleiman and Vera Jweinat told the police they did not have a gun in the house, bullets were found in Farhan's room during the investigation of this crime.

     Later that day, Moyer, Hinojosa and Morgan went to Ray's and Harrison's house and divided up jewelry, watches, "little bags," shoes, clothing and a computer.  After the others left, Ray started talking about leaving California and Harrison took him to a motel in Sacramento.  Ray returned later that night because he did not want to be without Harrison, and Harrison began packing so they could go to Reno.  At some point she realized that police were entering Moyer's house.  She told Ray to leave, but he did not do so and they were both arrested that night.

     Another important trial witness was Mariah Alsop, the significant other of Moyer's mother, Gail Garcia.  Alsop testified at trial that on the day after Moyer's arrest, she and Garcia went to Moyer's home to remove Moyer's belongings.  While Alsop was standing outside smoking a cigarette, a man she did not then know, but whom she identified as appellant Morgan, came up to her and started talking.  He said, "I'm so scared," and when asked why, said it was "because they're looking for me."  Morgan told Alsop that they were supposed to steal a car and he was going to drive one of the cars, then said that he waited at a McDonald's and they were supposed to bring the car to him.  He then changed his story and said that he and Ray went into a house and found an old man there.  They bound the man and put him in the bathroom, and Morgan told him that if he kept his mouth shut nothing would happen.  Morgan went upstairs to look for things to steal and heard Ray yelling, "You better get the f—down here, I just hit this old man."  Morgan went downstairs and saw Ray viciously beating the old man, who had blood running down his head.  Morgan told Alsop that he joined Ray in the beating, and then he and Ray left.

     Ray testified in his own defense and claimed that he had moved out of the home he shared with Harrison several days before the crime was committed and had not participated at all.  He explained that he was visiting Harrison on the night of their arrest because they needed to discuss their relationship.  Ray's friend John Lee and other

members of Lee's family testified that Ray was at their home in Sacramento during the day on May 5, 2006, a fact they remembered because of the Cinco de Mayo holiday.

Ray also called Detective Carey as a witness, who testified that a man named Jason Stevens had been discovered with jewelry taken from the Jweinats' house. Carey did not consider him a suspect in the case and had not tried to verify his whereabouts on May 5, 2006. Other individuals in the Woodland and Davis areas were also caught with jewelry that had been taken from the Jweinats' house.

In addition to Ray's alibi/third party culpability defense, appellants attempted to show that they were not liable for felony murder or the special circumstances because the injuries Farhan suffered during the robbery and burglary did not cause his death. The medical evidence was as follows:

Farhan was initially admitted to North Bay Medical Center on the day of the attack, and was then airlifted to U.C. Davis Medical Center for treatment, where he was admitted in critical condition. His jaw was broken, but the necessary surgery was delayed to allow the blood thinners that he was taking for his heart condition to leave his system. Farhan had difficulty breathing and was placed on a ventilator several times during his stay, and a tracheostomy tube was placed in his neck to allow him to breathe more easily. Surgery was performed on his broken jaw on May 12, 2006 (a week after the attack), and he remained in critical condition in the intensive care unit until May 16, 2006, when he was moved to a regular hospital ward. On May 17 he had a cardiac arrest and stopped breathing, which deprived his brain of oxygen. It was impossible to determine which occurred first—the cessation of breathing or the cardiac arrest. Although Farhan was resuscitated, he remained in a persistent vegetative state until he died 10 months later, on March 19, 2007.

Dr. Josselson, a forensic pathologist who testified as the prosecution's expert, testified that it was not possible to determine exactly what caused Farhan's heart to stop. The medical records noted that a mucous plug may have developed in his tracheostomy tube, thus blocking the flow of oxygen and causing a cardiac arrest due to the loss of oxygen. Though Farhan had been checked shortly before the episode, a mucous plug could have developed suddenly. Dr. Josselson also believed that the various stresses to Farhan—the recent attack, his stay at the hospital, the use of a breathing tube, his inability to readily communicate with hospital staff in English, all on top of a heart weakened by coronary disease—could have caused him to suffer cardiac arrest. The medical notes from Farhan's records showed that his blood pressure was elevated after the surgery, and that the doctors were trying to control his pain, another source of stress. Farhan had undergone a procedure on May 9, 2006 (a few days before his jaw surgery) to insert a filter into his vena cava so a blood clot developing in his leg would not go into his heart.

Farhan was not on a heart monitor at the time of his cardiac arrest, so there was no electrocardiogram (EKG) to indicate a problem immediately before the event. Dr. Josselson thought that both stress and a mucous plug contributed to the cardiac arrest, but either factor alone could have been the cause. Dr. Josselson believed that the assault during the burglary led to a chain of events causing cardiac arrest and that as a result of the cardiac arrest, Farhan went into a vegetative state and died.

The defense presented the expert testimony of Dr. Coleman Ryan, a cardiologist. According to Dr. Ryan, Farhan had suffered from coronary artery disease but had been doing well for several days before and after the jaw surgery on May 12, 2006.  He was no longer on a ventilator, his oxygen readings were good and his treating physicians had declared him stable.  Dr. Ryan characterized the cause of death as a "mystery."  It was unlikely that stress caused cardiac arrest, as stress is more likely to cause heart arrhythmia and there was no evidence of arrhythmia.  Dr. Ryan did not believe there was any evidence of a mucous plug, although he had not been provided with a hospital note by a U.C. Davis medical resident the day after the event noting "susp mucous plug" as a cause. He noted that while morphine (which was being administered to Farhan) could cause respiratory arrest, there was no indication of an excessive dose.  Dr. Ryan did not believe that the injuries Farhan suffered on May 5, 2006 caused the cardiac arrest.

Dr. Steven Karch, an expert in cardiac pathology, also testified for the defense. Dr. Karch believed the cause of death was undetermined, but was definitely not a heart attack, as the EKGs had been normal and there was no evidence of stressors.  In his opinion, a mucous plug was unlikely to have been the cause because a person deprived of oxygen in this manner is apt to thrash around trying to breathe, and there is no evidence that this occurred.  Dr. Karch acknowledged that Farhan's hands had been tied to the bed to prevent him from pulling out the tracheostomy tube.  Farhan suffered from an enlarged heart, which can cause sudden cardiac arrest and death.

*People v. Ray*, Nos. A127613, A127690, 2011 WL 3930322, *1-5 (Cal. Ct. App. Sept. 8, 2011).

On November 10, 2009 a jury found Moyer, Ray, and Morgan guilty of murder.  The jury found true as to all three defendants the burglary special circumstance allegation and also found true as to Ray and Morgan the robbery special circumstance.  On February 3, 2010, the trial court sentenced each of the defendants to a term of life imprisonment without possibility of parole.

Through counsel, Moyer appealed her conviction, arguing that: 1) the trial court erred in instructing on proximate cause because it failed to instruct on supervening cause; 2) the evidence was insufficient to prove that the injuries Jweinat suffered during the burglary were the cause of his death; 3) the trial court erred by failing to answer the jury's question about the term "acted with reckless indifference to human life" and denied Moyer the right to counsel when it answered the jury's question off the record and without the presence of counsel; 4) the

6

prosecutor committed misconduct by misstating the burden of proof; and 5) the existence of

cumulative error warranted the reversal of her conviction.  On September 8, 2011, the California

Court of Appeal affirmed Moyer's conviction in a reasoned, unpublished opinion.  *Ray*, 2011

WL 3930322, at *17.  Again proceeding through counsel, Moyer sought review in the California

Supreme Court, raising the same claims she had unsuccessfully presented to the Court of Appeal.

The supreme court summarily denied the petition on December 24, 2011.

Moyer timely filed a Petition for a Writ of Habeas Corpus to this Court on April 17,

2012.

## II. GROUNDS/CLAIMS

In her counseled Petition before this Court, Moyer raises the same claims she raised to

the state courts on direct appeal, namely that: 1) the trial court erred by failing to instruct on

supervening cause and counsel was ineffective for failing to request the instruction; 2) there was

insufficient evidence that the victim died of injuries suffered during the burglary; 3) the trial

court erred by failing to instruct correctly on the mental state required for the special allegation

and denied Moyer the right to counsel when it answered the jury's question out of counsel's

presence; 4) the prosecutor committed misconduct in explaining the meaning of reasonable

doubt; and 5) the existence of cumulative error warrants reversal of her conviction.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.

§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or

involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding,"
§ 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that
contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that
are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives
at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)
"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the
relevant state-court decision."  *Id.* at 412.  The holding must also be intended to be binding upon
the states; that is, the decision must be based upon constitutional grounds, not on the supervisory
power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where
holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it
cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"
*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are
beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S.
Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was
correctly applied).  It is a fundamental precept of dual federalism that the states possess primary
authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62,
67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and
application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state
court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536
U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004) (citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision.  *Edwards v. Lamarque*, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

A.      <u>Causation Issues (Claims 1, 2)</u>

Moyer first argues that the trial court violated her right to due process by failing to instruct the jury on supervening cause when it instructed on proximate cause and that her trial counsel was ineffective for failing to request a supervening cause instruction.  She similarly argues in claim 2 that there was insufficient evidence that the injuries Jweinat suffered during the burglary proximately caused his death.  Because the resolution of claim 1 requires consideration of whether the evidence was sufficient to establish that Jweinat's death was caused by the injuries he suffered during the burglary, the causation question raised in claim 2 is addressed first.

1.    <u>Sufficiency of the Evidence to Establish Causation</u>

Moyer argues that her "Fifth and Fourteenth Amendment due process rights were

violated when she was convicted without sufficient evidence of a necessary element of the crime,

namely, that her acts or those of her codefendants proximately caused Mr. Jweinat's death."  The

California Court of Appeal rejected that argument on direct appeal, concluding:

> In this case, the evidence showed that [Jweinat] was severely beaten by appellants
> Morgan and Ray while burglarizing his home.  Appellant Moyer aided and abetted
> Morgan and Ray in the burglary, knowing that [Jweinat] lived in the house.  Morgan
> and/or Ray struck [Jweinat] with enough force to knock out his dentures and break his
> jaw.  When he was admitted to the hospital, [Jweinat] had difficulty breathing and was
> given a tracheostomy tube to help him breathe.  After he underwent the surgery necessary
> to repair his broken jaw, he suffered a cardiac arrest and his brain was deprived of
> oxygen.  Although he was resuscitated, he remained in a persistent vegetative state before
> dying several months later.  Dr. Josselson, the forensic pathologist who conducted the
> autopsy and reviewed the medical records associated with the injuries, believed the
> cardiac arrest that ultimately lead to [Jweinat's] death was caused by either a mucous
> plug in the tracheostomy tube, or the stress of his injuries and hospitalization, or some
> combination thereof.  He explained, "[T]he assault led to a train of events that caused his
> cardiac arrest; and as a result of the cardiac arrest, he went into this persistent vegetative
> state and died."  Dr. Josselson's testimony provided substantial evidence that [Jweinat's]
> death was caused by the violent acts committed against him.

*Ray*, 2011 WL 3930322, at *6.

As articulated by the Supreme Court in *Jackson*, the federal constitutional standard for

sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to

the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the

original); *see McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard).  This

Court must therefore determine whether the California court unreasonably applied *Jackson*.  In

making this determination, this Court may not usurp the role of the finder of fact by considering

how it would have resolved any conflicts in the evidence, made the inferences, or considered the

evidence at trial. *Jackson*, 443 U.S. at 318-19. Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law. *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set forth in state law. *Jackson*, 443 U.S. at 324 n.16. A fundamental principle of our federal system is "that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *see West v. AT&T*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law . . . ."). "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 345 (2006) (quoting *Smith v. Philips*, 455 U.S. 209, 221 (1982)) (internal quotation marks omitted). It is through this lens that this Court must view an insufficiency of the evidence claim.

Under California law, "[t]o constitute murder, there must be, in addition to the death of a human being, an unlawful act which was the proximate cause of that death. [¶] The proximate cause of a death is a cause which in natural and continuous sequence, produces the death and without which the death would not have occurred." *People v. Catlin*, 26 P.3d 357, 405 (Cal.

11

2001) (quoting CALJIC Nos. 8.55 and 8.58), *overruled on other grounds*.  "[A]s long as the jury

finds that without the criminal act the death would not have occurred when it did, it need not

determine which of the concurrent causes was the principal or primary cause of death." *Id*.

"Rather, it is required that the cause was a substantial factor contributing to the result." *Id.*  This

holds true even where the victim's preexisting physical condition was a substantial factor

causing death.  *Id.*  "So long as a victim's predisposing physical condition, regardless of its

cause, is not the *only* substantial factor bringing about his death, that condition . . . in no way

destroys the [defendant's] criminal responsibility for the death."  *Id.* (citations omitted).

Moyer contends:

> [T]here was no testimony "to a reasonably medical certainty," or even a
> "reasonable medical probability," as to the cause of Mr. Jweinat's death.  Other than Dr.
> Josselson, the prosecution offered no medical evidence in support of its theory that Mr.
> Jweinat suffered the May 17 cardiac arrest as a result of the broken jaw and related
> injuries of May 5.  On May 16, four days after jaw surgery, Jweinat was discharged from
> the ICU to a regular hospital wing.  He was deemed "stable."  He was not suffering from
> any cardio or pulmonary difficulties.  Dr. Josselson conceded that the U.C. Davis doctors
> would not have released him from the ICU if he had been having problems breathing.  On
> May 17, at 9:30 a.m. Mr. Jweinat was examined by a doctor, who deemed his condition
> stable and satisfactory.  However, then minutes later, at 9:40 a.m., without prior
> indicators, Jweinat stopped breathing and his heart temporarily stopped.  He was
> resuscitated thereafter, having suffered anoxic encephalopathy, and remained in a coma
> for nine months.  There were no contemporaneous indicators of what caused this event.

Pet. Mem. at 33 (record citations omitted).

Moyer's argument is nothing more than an attack on Dr. Josselson's testimony.  This

Court is precluded, however, from either re-weighing the evidence or assessing the credibility of

witnesses.  *Schlup v. Delo*, 513 U.S 298, 330 (1995); *Bruce v. Terhune*, 376 F.3d 950, 957-58

(9th Cir. 2004).  Moyer specifically takes issue with the Court of Appeal's statement that Dr.

Josselson "was quite certain that the injuries caused by the assault were the cause of [Jweinat's]

12

death in the hospital, though he was unable to say whether the cardiac arrest was caused by a mucous plug in the tracheostomy tube, the overall stress of the assault and subsequent hospitalization, or some combination of the two." She "submits here that the Court of Appeal's statement is an unreasonable interpretation of the record, and as such it constitutes an unreasonable application of governing legal standards within the meaning of AEDPA." But Moyer cites no federal law to support her claim. Although she cursorily refers to the Fifth and Fourteenth Amendment right to due process, the gravamen of her claim is that the trial court misapplied California state law, which this Court notes arises in the context of personal injury actions and not criminal cases, requiring expert testimony of a reasonable medical probability to establish causation. Even if this Court could find error under state law, it cannot support the granting of habeas relief in federal court. *See Estelle*, 502 U.S. at 67-68, 71-72 (federal habeas corpus relief is not available for violations of state law or for alleged error in the interpretation or application of state law).

Under *Jackson*, this Court's role is simply to determine whether there is any evidence, if accepted as credible by the trier of fact, sufficient to sustain conviction. *Schlup*, 513 U.S. at 330. The United States Supreme Court has recently even further limited a federal court's scope of review under *Jackson*, holding that "[a] reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos v. Smith*, 132 S. Ct. 2, 4 (2011) (per curiam). *Jackson* "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Id.* at 3-4. Under *Cavazos*, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court

13

disagrees with the state court.  The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id.* at 4 (*quoting Renico v. Lett*, 559 U.S. 766, 773 (2010)).

Although it might have been possible to draw a different inference from the evidence, this Court is required to resolve that conflict in favor of the prosecution.  *See Jackson*, 443 U.S. at 326.  Viewing the evidence in the light most favorable to the verdict, this Court concludes that there was sufficient evidence introduced at Moyer's trial from which a rational trier of fact could have found beyond a reasonable doubt that the injuries he sustained during the burglary "caused" the death of Jweinat, as that term is defined by California law.  The record does not compel the conclusion that no rational trier of fact could have found proof that the actions of Moyer and her codefendants caused Jweinat's death, especially considering the deference owed under *Jackson*, *Cavazos*, and the AEDPA.  The state court's rejection of Moyer's legal sufficiency claim is therefore not "objectively unreasonable" under *Cavazos*.  132 S. Ct. at 4.  Accordingly, Moyer is not entitled to habeas relief on her claim that the evidence introduced at trial was insufficient to support the jury's finding that the injuries inflicted upon Jweinat during the robbery were the cause of his death.

2.     Failure to Instruct—Supervening Cause/Ineffective Assistance of Counsel

In support of her claim that the trial court erred in failing to *sua sponte* instruct the jury on a supervening cause, Moyer asserts:

> Dr. Josselson opined that one possible cause of death was that there might have been a mucous plug which clogged Mr. Jweinat's breathing tube.  Ordinarily if that happened, the patient would be able to resolve the problem by dislodging the breathing tube.  Alternatively, the patient could press the nurse's call button.  Here, however, Mr. Jweinat could do neither, because his hands were tied to the bedrails.

Seen in this light, the acts of the hospital staff in restraining Jweinat's hands could be considered in law as a supervening or intervening cause of his death, which was not reasonably foreseeable.

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380 (1990). The question is whether the instruction, when read in the context of the jury charges as a whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471 U.S. 307, 309 (1985). This Court must also assume in the absence of evidence to the contrary that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it must violate some constitutional right, and it may not be judged in artificial isolation but must be considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at 72. This Court must also bear in mind that the Supreme Court has admonished that the inquiry is whether there is a reasonable likelihood that the jury applied the challenged instruction in a way that violates the constitution and that the category of infractions that violate "fundamental fairness" is very narrowly drawn. *Id.* at 72-73. "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process clause has limited operation." *Id*. at 73 (citation omitted). Where the defect is the failure to give an instruction, the burden is even heavier because an omitted or incomplete instruction is less likely to be prejudicial than an instruction that misstates

the law.  *See Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  In those cases, the inquiry is

whether the trial court's refusal to give the requested instruction "so infected the entire trial that

the resulting conviction violates due process."  *Id.* at 156-57; *Estelle*, 502 U.S. at 72.

On direct appeal, the Court of Appeal concluded that the trial court was not required to

*sua sponte* instruct the jury on the hospital's negligence as a superceding cause "because

substantial evidence did not support such an instruction and it did not appear the defense was

relying on that theory."  *Ray*, 2011 WL 3930322, at *8.  The appellate court reasoned:

> No expert testimony was elicited on the subject.  Appellants argued at trial that
> the prosecution had failed to prove the injuries inflicted on [Jweinat] were the cause of
> his death, but they never suggested (to the court or to the jury) that the hospital was
> instead responsible or that the possible mucous plug was a result of medical negligence.
> Appellants contend the hospital should not have employed the wrist restraints that
> were used to prevent [Jweinat] from pulling out the tracheostomy tube, because these
> restraints rendered him unable to remove the tube when it became clogged.  This
> speculative assertion, raised for the first time on appeal, is not supported by any of the
> medical testimony at trial and is not a conclusion obvious to a layperson.  No substantial
> evidence was presented at trial that would have supported the instruction now proposed
> by the appellants.

*Id.* (internal citations omitted).

Moyer cites no federal law compelling the provision of a superceding cause instruction

under these circumstances and indeed cites only state law in support of her claim.  However, "the

fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief."

*Estelle*, 502 U.S. at 71-72 (citing *Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) ("[T]he

Due Process Clause does not permit the federal courts to engage in a finely tuned review of the

state evidentiary rules.")); *Horton v. Mayle*, 408 F.3d 570, 576 (9th Cir. 2005) ("If a state law

issue must be decided in order to decide a federal habeas claim, the state's construction of its

own law is binding on the federal court.").  Claims of error in state jury instructions are generally

a matter of state law that do not usually invoke a constitutional question. *Gilmore v. Taylor*, 508 U.S. 333, 342-43 (1993). This Court is bound by the state appellate court's determination that the trial court was not required under California law to *sua sponte* give a superceding cause instruction in the absence of any due process violation. Moyer fails to establish a due process violation here because she may not transform her state instructional error claim into a federal claim by simply asserting a violation of her constitutional rights. *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1996) (a petitioner cannot transform a state-law issue into a federal one by simply asserting a due process violation); *see also Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1988) (an instructional error "does not alone raise a ground cognizable in a federal habeas corpus proceeding") (citation omitted).

As the appellate court noted, the jury was instructed on the causation principles relevant to this case:

> CALCRIM No. 240 provided in part, "An act causes death if the death is the direct, natural and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes." CALCRIM No. 620 stated, "There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death. [¶] Farhan Jweinat may have suffered from an illness or physical condition that made him more likely to die from the injury than the average person. The fact that Farhan Jweinat may have been more physically vulnerable is not a defense to murder. If the defendant's act was a substantial factor causing the death, then the defendant is legally responsible for the death. This is true even if Farhan Jweinat would have died in a short time as a result of other causes or if another person of average health would not have died as a result of the defendant's actions. [¶] If you have a reasonable doubt whether the defendant's act caused the death, you must find him or her not guilty."

*Ray*, 2011 WL 3930322, at *8 n.5.

17

The Court finds no basis for disagreeing with the California Court of Appeal's conclusion that the trial court did not fail to *sua sponte* give the jury an instruction on superceding cause.  Moyer cannot establish that the omission of an instruction on superceding cause rendered her trial fundamentally unfair in light of the causation instructions as a whole and because sufficient evidence did not support an instruction on superseding cause.  *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000) (holding that was no constitutional error where the trial court refused to give an instruction not supported by the evidence); *United States v. Yarbrough*, 852 F.2d 1522, 1541 (9th Cir. 1988) (stating that an instruction can be given only if there is "some foundation" in the evidence).

The Court of Appeal likewise rejected Moyer's companion claim that counsel was ineffective for failing to request a superceding cause instruction because, "[e]ven if counsel had requested an instruction on superseding cause based on medical negligence, there is no reasonable probability the court would have given it when it was not supported by substantial evidence."  *Ray*, 2011 WL 3930322, at *8.

To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*  The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at

18

393-95.  Thus, Moyer must show that her trial counsel's representation was not within the range of competence demanded of attorneys in criminal cases, and that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,* 474 U.S. 52, 57 (1985).

An ineffective assistance of counsel claim should be denied if the petitioner fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland,* 466 U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if the defendant fails on one).  In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v. Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

The record indicates that Moyer's trial counsel acknowledged that Moyer was not relying on any negligence theory and agreed with counsel for Ray and Morgan that there was no evidence to support such theory.  The appellate court's conclusion that, "[e]ven if counsel had requested an instruction on superseding cause based on medical negligence, there is no reasonable probability the court would have given it when it was not supported by substantial evidence" is neither unreasonable nor contrary to federal law given that no expert testimony had been elicited or direct argument made on that theory.  Moyer therefore cannot establish that trial counsel was ineffective for failing to request an unsupported instruction.

Nor can Moyer show that trial counsel was ineffective for failing to advance evidence in support of a negligence theory.  California law mandates that, "[w]hen a person inflicts a wound on another which is dangerous, or calculated to destroy life, the fact that the negligence, mistake, or lack of skill of an attending physician or surgeon contributes to the death affords no defense to a charge of homicide."  *People v. McGee*, 187 P.2d 706, 712-13 (Cal. 1947); *see also People v. Roberts*, 826 P.2d 274, 295 (Cal. 1992) ("If a person inflicts a dangerous wound on another, it is ordinarily no defense that inadequate medical treatment contributed to the victim's death."). While the California Supreme Court also held in *Roberts* that "when medical treatment is grossly improper, it may discharge liability for homicide if the maltreatment is the sole cause of death and hence an unforeseeable intervening cause," 826 P.2d at 295, that situation is not presented here.  Thus, trial counsel's disclaimer in favor of advancing other theories was reasonable in light of California law dictating that a medical negligence theory was not appropriate under the circumstances of this case.  Accordingly, Moyer is not entitled to relief on any claim relating to the causation issues.

B.      Special Circumstance Allegation (Claim 3)

Moyer next asserts that the trial court failed to instruct correctly on the mental state required for the special circumstance allegation and denied her right to counsel when it answered the jury's question outside counsel's presence.  In addressing this claim on direct appeal, the Court of Appeal described the following facts:

> The trial court instructed the jury with CALCRIM No. 703, which provided in relevant part, "If you decide that a defendant is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstances of Murder in the course of Robbery or Murder in the course of First Degree Burglary, you must also decide whether the defendant acted either with intent to kill or with reckless indifference to human life.  [¶]  In order to prove these special circumstances for a defendant who is

not the actual killer but who is guilty of first degree murder as an aider and abettor, the People must prove either that the defendant intended to kill, or the People must prove all of the following:  [¶]  1. The defendant's participation in the crime began before or during the killing;  [¶]  2. The defendant was a major participant in the crime;  [¶]  AND 3. When the defendant participated in the crime, he or she acted with reckless indifference to human life.  [¶]  *A person acts with reckless indifference to human life when he or she knowingly engages in criminal activity that he or she knows involves a grave risk of death."* (Italics added.)

During deliberations, the jury sent a note asking, "Does the law or other jury instructions expand on the statement 'a person acts with reckless indifference to human life' found in 703 # 3?"  The court discussed the note with counsel, observing that the phrase had been adequately defined in CALCRIM No. 703.  Counsel for defendant Ray stated, "Your Honor, I have no objection to the Court going into the jury room and explaining to them the same way that you did to us.  I think that's—that does answer the question.  It's responsive, and it is the law.  They obviously can't be instructed on case law and things like that, so I think that would be the best move."  Counsel for Morgan and Moyer agreed and the court indicated it would do what counsel suggested.

*Ray*, 2011 WL 3930322, at *9.

As an initial matter, the state court found that Moyer's claim of instructional error and denial of right to counsel were forfeited because she agreed to the court's response to the jury without requesting an additional instruction and agreed that the trial court could refer the jury to CALCRIM No. 703 outside counsel's presence.  *Id.*  The claim is therefore procedurally defaulted from federal habeas review under the contemporaneous-objection rule.  *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991) (a federal court will not review a claim if the state court's rejection of the claim rests on a state law ground that is independent of the federal question and adequate to support the judgment).  The Ninth Circuit has repeatedly recognized and applied the California contemporaneous objection rule in affirming denial of a federal habeas petition on grounds of procedural default where there was a complete failure to object at trial.  *See, e.g.*, *Inthavong v. Lamarque*, 420 F.3d 1055, 1058 (9th Cir. 2005); *Paulino v. Castro*, 371 F.3d 1083, 1092-93 (9th Cir. 2004).

Moreover, Moyer's claim fails on the merits.  Moyer first argues that the California Supreme Court "held in [*People v. Estrada*, 907 P.2d 1197 (Cal. 1995),] that if a clarifying instruction is requested, the court should provide such clarification by instructing in the language of *Tison v. Arizona*, 481 U.S. 137 (1987)."  She further contends that the trial court should have answered the jury's question with an instruction along the lines indicated by the California Supreme Court in *People v. Dellinger*, 783 P.2d 200, 202 (Cal. 1989).  But in that case, the jury was instructed on implied malice, which requires a finding of a "conscious disregard for life", *Dellinger*, 783 P.2d at 202, and not a reckless indifference to human life, and thus is inapplicable here.  Moyer can cite to no federal authority equating the two terms or requiring that the definition for a "conscious disregard for life"—"an intentional act involving a high degree of probability that it will result in death," *id.*—be given in these circumstances to conform with the United States Supreme Court's decision in *Tison*, which held that the Eighth Amendment does not bar the death penalty as disproportionate in a situation where the defendant, in participating in a felony that resulted in murder, acted as a major participant and with reckless indifference to human life, 481 U.S. at 157-58.

Because the instruction was not erroneous, Moyer likewise cannot prevail on her claim that she was denied her right to counsel when the trial court answered the jury's question outside of her presence.  As the appellate court noted, "there being no contrary indication in the record, we presume the court responded to the jury question as agreed and simply referred the jurors to the existing instruction without providing further amplification of the law or additional instructions.  The absence of counsel did not deprive [Moyer] of the assistance of counsel during a critical state of the proceedings and could not have been prejudicial under these

circumstances." *Ray*, 2011 WL 3930322, at *10.  Moyer presents no contrary evidence in this Petition either.

That the instruction was not erroneous further dooms Moyer's claim that her counsel was ineffective for failing to request an additional instruction for the "reckless indifference" instruction and in allowing the court to answer the jury's note outside of counsel's presence.  As the appellate court likewise concluded, Moyer "cannot establish the prejudice necessary to prevail on such a claim because it is not reasonably probable [she] would have obtained a more favorable result had [she] requested amplification of 'reckless indifference' or been present for the court's response to the jury question."  Moyer therefore cannot prevail on this claim either.

C.    Prosecutorial Misconduct (Claim 4)

Moyer additionally contends that her right to due process was violated when the prosecutor gave four analogies of the meaning of reasonable doubt "that were legally incorrect and that unfairly trivialized the prosecution's burden of proof."  In considering this claim on direct appeal, the Court of Appeal laid out the following facts:

> The prosecutor did not discuss the reasonable doubt standard during the initial phase of closing argument.  Moyer's counsel described the standard as one "we don't really use in our lives on a day-to-day basis, even on an unusual basis.  You know, the big decisions you make, like buying a house or getting married, having kids, you don't use this standard of proof."  She also noted that one situation in which the reasonable doubt standard might be employed was the decision to withdraw a family member from life support: "[Y]ou would want to make sure you have evaluated every possible option for that person. . . .  And so that is the same standard that you would use in deciding whether these charges are true."  Morgan's counsel also commented on the burden of proof, describing it as "that degree of certainty that you would make in a medical decision where if you're wrong someone is going to die. . . .  [I]f at the end of that discussion, you have enough faith that you're willing to risk your child's life, that's beyond a reasonable doubt."  He gave a second example of reasonable doubt as "the level of comfort in a parachute that you would have before you jump out of a plane at 30,000 feet, right."

        During rebuttal argument, the prosecutor addressed the subject of proof beyond a
reasonable doubt when discussing the import and reliability of Karly Harrison's
testimony: "Now, what the Court told you when he was reading you the instructions is
that there has to be corroboration to accomplice testimony, and the jury instruction tells
you that it only has to be slight.  There's plenty of corroboration in this case, and what
does that give you, well, I'm going to talk about beyond a reasonable doubt, what it is
and what it isn't.  [¶]  Beyond a reasonable doubt is you take a puzzle and let's say it has
the Statue of Liberty on it, and you start putting the pieces together, and first you have
the ocean and the water, and then you start getting to the island part and pretty soon you
start building the Statue of Liberty and you can tell what you're building.  And once the
picture becomes clear to you, then you can convict somebody."  Defense counsel made
an objection, which was overruled.

        The prosecutor continued: "So the picture is clear in this case.  Is there enough
pieces put together in this puzzle for you to convict these three defendants.  Well, let's
think about that.  We talked a lot about Karly Harrison, the defense did.  She's just
adding pieces because there's other pieces to this case, isn't there.  There's the stolen
property which the Judge gave you a jury instruction that you consider as something as
evidence of a recent burglary.  It can't be the only thing you consider, but it's one thing.
Contrary to what you were told that you can't consider it, but you can.  And there's other
evidence . . . .  [¶]  What reasonable doubt is not, Ladies and Gentlemen, it is not if your
child is in the hospital and going to die that you're going to make a decision based on
beyond a reasonable doubt.  You are going to make a decision based on all doubt, and
that is not the standard in a criminal case.  [¶]  And I guarantee it, Ladies and Gentlemen,
when you stood up and took your vows when you got married, you didn't do it beyond a
reasonable doubt.  You had no doubt that that person you were standing next to was the
person you wanted to spend the rest of your life with.  You weren't like thinking, well,
yeah, I don't know, are my doubts reasonable.  No.  Those aren't even good comparisons.
Because if somebody's life is on the line, you're going to make sure you have every fact
and know every possible thing that you need to know before you make a decision.  That
is not the standard in a criminal case.  As I told you in voir dire, the standard in this case
is the same in a DUI, is the same in a petty theft."

*Ray*, 2011 WL 3930322, at *11-12.

        Moyer contends that the prosecutor's references to the following analogies were

improper: 1) recognizing the image of the Statute of Liberty in a jigsaw puzzle even though

some pieces are still missing; 2) determining medical treatment for a dying child; 3) getting

married; and 4) making decisions where someone's "life is on the line."

                                        24

To successfully raise a claim cognizable on habeas review based on a prosecutor's comments at trial, a petitioner must demonstrate that the prosecutor's comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  Under this standard, only egregious prosecutorial misconduct can give rise to a constitutional claim.  *See Duckett v. Godinez*, 67 F.3d 734, 743 (9th Cir. 1995).  A prosecutor's comments in summation constitute grounds for reversal only when the remarks caused actual prejudice.  *Shaw v. Terhune*, 380 F.3d 473, 478 (9th Cir. 2004) (applying harmless error test to claim of prosecutorial misconduct in summation).  Moreover, a prosecutor must have "reasonable latitude" to fashion closing arguments.  *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991).

As the Court of Appeal noted, Moyer's counsel only objected to the prosecutor's use of the puzzle analogy; the appellate court found that Moyer had forfeited her claim with respect to the remaining statements.  *Ray*, 2011 WL 3930322, at *13-14.  The forfeited claims are therefore procedurally defaulted from federal habeas review under the contemporaneous-objection rule. *Coleman*, 501 U.S. at 729-30; *Inthavong*, 420 F.3d at 1058; *Paulino*, 371 F.3d at 1092-93.

The Court of Appeal further concluded that the prosecutor's comparisons did not constitute misconduct.  With respect to the puzzle analogy, the appellate court concluded, "Although both courts and prosecutors are well-advised to refrain from embellishing on the statutory definition of reasonable doubt, it is not reasonably likely the jurors applied the jigsaw puzzle analogy in this case to lessen the prosecution's burden of proof."  *Ray*, 2011 WL 3930322, at *13.  The appellate court similarly found no merit with respect to her statements

referring to decisions involving a dying child or where someone's "life is on the line."  It reasoned:

> [T]he gist of the prosecutor's argument suggested that some decisions are so serious that they cannot be made in the face of *any* doubt, whereas the reasonable doubt standard does not require the elimination of all possible doubt.  The underlying legal point is an accurate description of the law, even if the factual scenario used to illustrate it was inapt.  It is not reasonably likely the jury construed the remarks in a manner that diminished the standard of proof beyond a reasonable doubt.

*Id.* at *14.

Finally, the appellate court determined that "the prosecutor's reference to marriage was somewhat cryptic, but seemed to suggest (incorrectly) that the decision to marry is one that typically involves *no* doubt.  Again, however, the point being made was that proof beyond a reasonable doubt does not require the elimination of all possible doubt.  Viewing the comment in the context of this broader point, it is not reasonably likely the jury applied the remarks in an objectionable fashion."  *Id.*

In support of her claim that the challenged statements constituted misconduct, Moyer cites only to state law.  But again, federal habeas relief is not available for alleged errors of state law.  *Swarthout*, 131 S. Ct. at 863.  Moyer points to no federal law that the appellate court's determinations contravene or unreasonably apply, and this Court is not aware of any.  Indeed, the trial court instructed the jury that "[p]roof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.  The evidence need not eliminate all possible doubt because everything in life is open [to] some possible or imaginary doubt."  The jury was further instructed that "[n]othing that the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence."  *Id.* We must presume that the jury followed its instructions.  *See Weeks*, 528 U.S. at 234.  In light of

26

the record and the instructions as a whole, this Court cannot say that the appellate court's resolution of this claim was unreasonable or that the prosecutor's remarks deprived Moyer of a fair trial.  Moyer is therefore not entitled to relief on this claim.

D.    Cumulative Error (Claim 5)

Finally, Moyer argues that, "[e]ven if no single one of the errors above requires reversal of [Moyer's] convictions standing alone, reversal is required due to their cumulative prejudicial effect on [her] rights to due process of law under the Fifth and Fourteenth Amendments."

"While the combined effect of multiple errors may violate due process even when no single error amounts to a constitutional violation or requires reversal, habeas relief is warranted only where the errors infect a trial with unfairness."  *Peyton v. Cullen*, 658 F.3d 890, 896-97 (9th Cir. 2011) (citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302-03 (1973)).  Such "infection" occurs where the combined effect of the errors had a "substantial and injurious effect or influence  in determining the jury's verdict."  *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (citation omitted).  In other words, where the combined effect of individually harmless errors renders a criminal defense "far less persuasive than it might [otherwise] have been," the resulting conviction violates due process.  *See Chambers*, 401 U.S. at 294.

As discussed above, Moyer does not allege any claims that amount to errors of constitutional dimension.  Accordingly, she demonstrates no errors that can accumulate to a level of a constitutional violation, and the state courts therefore did not unreasonably deny her relief on this claim.  *See Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002).

V. CONCLUSION AND ORDER

Moyer is not entitled to relief on any ground raised in her Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: August 15, 2014.

_____/s/James K. Singleton, Jr._____
JAMES K. SINGLETON, JR.
Senior United States District Judge

28